J. F. Weber, Appellee, v. City of Webster City, Appellant.

NEGLIGENCE: Acts Constituting Negligence—Ordinary Way of
1 Doing a Thing—Use of Machinery, Etc. Negligence may not be predicated on the doing of a thing in the usual, ordinary and proper manner, and with mechanical devices as perfect as possible, *even though it be known that, at times, the device will not accurately perform its function*—with resulting danger.

PRINCIPLE APPLIED: A master installed a heater, for

the purpose of heating water with exhaust steam before injecting the water into the steam boilers. It was sufficiently strong *as a heater*, but not sufficient to withstand great pressure from live steam from the steam boilers. Water for the heater was principally supplied by condensing, in a pit outside the plant, the steam which returned to the plant from heating mains. This condensed water passed into a mechanical device, known as a trap. When the trap was full, it automatically dumped, and in so doing, automatically turned on steam from the steam boilers, which steam forced the water out of the trap and into the heater, which was inside the plant. When emptied of its contents, the trap automatically swung back into position, and in so doing, cut off the steam. The supply of water in the pit unavoidably varied under different changes in temperature. *The use of such a trap was the usual, ordinary, and proper manner of getting the water into the heater.* While nothing more effective had been invented, yet it was known that the trap could not be so made that at *all* times it, when empty, would swing back far enough to cut off the live steam from the boilers. This resulted in the passing of live steam directly into the heater from the steam boilers. The heater burst, and injured the servant. Assuming that the trap had failed to swing back sufficiently to cut off the steam, *held*, no actionable negligence on the part of the master was revealed.

**MASTER AND SERVANT:** Place of Work—Non-Supervision of
2    **Dangerous Device.** A master who deliberately changes his machinery from a condition of automatic safety to one of constantly recurring danger, unless guarded by human agency, and then fails to provide the human agency, renders the servant's place of work legally unsafe. So held where the master closed up an automatic overflow pipe from a steam boiler, and substituted in lieu thereof a valve workable only by hand.

*Appeal from Hamilton District Court.*—R. M. WRIGHT, Judge.

JANUARY 9, 1918.

ACTION to recover for personal injuries. The opinion shows the facts. Verdict and judgment for the plaintiff. Defendant appeals.—*Modified and affirmed.*

*Wesley Martin, D. C. Chase,* and *J. W. Lee,* for appellant.

*O. J. Henderson* and *Kenyon, Kelleher & Price,* for appellee.

1. NEGLIGENCE: acts constituting negligence: ordinary way of doing a thing: use of machinery, etc.

GAYNOR, J.—Plaintiff brings this action to recover damages for personal injuries received while in the employ of defendant. His injuries were due to the rupture of a water heater, used by the defendant in and about its plant. Plaintiff, at the time, was acting as engineer. The accident occurred May 13, 1913.

In his petition, the plaintiff says that he was employed by the defendant as an engineer in its electric light plant; that, at the time of the injury, he was operating the engine in said plant for and in behalf of the city; that, prior to and at the time of the injury, defendant was operating at said plant a contrivance known as a "heater," the purpose of which was to heat the water to be used in the boilers in said plant before pumping the same into the boilers; that the water in the heater was heated by means of exhaust steam turned into the same from the engines; that the water so heated by means of said heater was obtained in part from the water mains, and in part from two certain automatic devices, or traps, which accumulated the condensed steam from the city heating system and from the engines, and the water so accumulated in the traps was, from time to time, forced into the heater by live steam injected into them from the boilers; that, when the heater became filled with water, it was subjected to the full pressure of the steam in the boilers, and became at once a dangerous instrumentality, and liable to explode and burst.

The negligence charged is:

· 1. That the defendant negligently failed to provide any automatic valve or device for keeping the water in

said heater at a safe and proper level, or for regulating the steam pressure therein.

2. That the heater was defective, and negligently constructed and improperly put together, so that the same was not strong enough to resist the pressure to which it was, from time to time, subjected by the operation of the steam, as aforesaid.

3. That the defendant was negligent in maintaining said trap or device in such a manner as automatically to allow the direct pressure from the live steam from the boilers to be injected into said heater, the heater not being strong enough, or so constructed as to resist such pressure.

In an amendment to his petition, plaintiff says that defendant wholly failed to install or attach any safety valve or automatic or other device for maintaining the water in said heater at a safe and proper level, so as to regulate, limit, or control the steam pressure therein, save as said water level or steam pressure might be regulated or controlled by the opening by hand, from time to time, of a valve or faucet attached to said heater, whereby the level of the water therein might be reduced.

Plaintiff further says that, at the time of the accident, the heater had become filled and clogged with water, by reason of the fact that there was no means provided for its escape; that, by the automatic operation of the two traps hereinbefore referred to, the full pressure of the steam in said boilers was injected into said traps, and through them into the said heater; that, by reason of the pressure aforesaid, the heater suddenly exploded "by reason of the pressure injected into the same, as hereinbefore described," thereby greatly injuring plaintiff.

To these charges, defendant interposed a general denial, and further alleged that it was free from negligence, and that, if there was any negligence at all, it was that of a fellow servant of the plaintiff, for which defendant was

in no way liable.   Upon these issues, the cause was tried
to a jury, and a verdict returned for the plaintiff.

The first question presented is the sufficiency of the
evidence to charge defendant with actionable negligence.

The evidence discloses that the defendant city owned
and operated a plant in the city of Webster City, where
it generated electricity for sale to the residents of the city.
The same plant was used for furnishing water to the resi-
dents of the city for private consumption.   It was also used
for supplying steam heat to a portion of the city.   The plant
was a combination waterworks, electric light, and steam
heating plant.   The plant in question had been in operation
only a few months before the accident occurred.   Plaintiff
was first employed in this plant as fireman in the boiler
room.   In this capacity he worked from December to
March, 1913.   From March until May 13th, the time of the
injury, he was employed as engineer.   The building in
which this machinery was installed was 50 feet by 80 feet,
the long way of the building being north and south.   A
partition divided the building into two rooms, 50 feet east
and west by 40 feet north and south.   The north room was
called "the boiler room," and the south room, the "engine
room."   The boiler room contained three large boilers,
bricked in, ranged side by side.   These boilers occupied
about two thirds of the width of the room, and extended
from the south end of the boiler room north, 18 or 20 feet.
The engine room contained two Murray-Corliss engines,
with electric generators attached, and other equipment.
There was a doorway in and near the east end of the parti-
tion wall.   The three boilers are situated in the southwest
corner of the boiler room.   Immediately to the east of
them was situated the water heater in question.   This wa-
ter heater was near the south end of the boiler room, on
the west side of the doorway from the engine room to the
boiler room.   Persons passing from the engine room to the

boiler room passed on the east side of the heater. This heater was mounted on iron legs, and elevated to a position about six feet above the floor. The heater was in the shape of a boiler, 10 feet long by 3½ feet in diameter. The interior of the heater consisted of a series of pans, twelve in number, arranged in six tiers, two pans in each tier, the lower pans being the larger, and the upper ones, the smaller. The water which was to be heated in this heater entered the heater at the top, flowed into the top pan, overflowed into the pan below, which was slightly wider, and so on through the series of pans to the bottom pan, and from the bottom pan to the bottom of the heater. There was a baffle plate at the head of the heater, six to ten inches above the bottom of the heater. When the water rose above this baffle plate, or dam, according to the original design of the heater, it could flow out through an open overflow pipe. Soon after the installation of this heater, the defendant, through its superintendent, discovered that this overflow pipe caused a waste of water, and closed the overflow pipe with a valve which could be manipulated by hand, and by that method, the excessive pressure, if any occurred, could be relieved.

There were three sources from which water was supplied to this heater. One was from the city mains. This was piped directly into the heater, the connection being at the south end of the heater. The second consisted of a small trap, by means of which the condensed steam from the engines passed into the heater. The third source, and the one apparently involved in this controversy, was through a two and one-half inch pipe, which was connected close to the north end of the heater, and extended outdoors to a pit situated near the building. In this pit, the return water —being the condensation of steam from the city heat mains —was collected and forced into a trap by the pressure of steam. The trap was so adjusted that, when it became filled,

or nearly so, it tilted and dumped its load. The steam from the boilers behind forced the water through the pipe directly into the trap, but the trap was so designed and arranged that, when emptied, or practically emptied, the trap would tilt back into its original position, and automatically shut off the pressure of the live steam.. The return of the trap to its position, after being so tilted, would also shut off the supply of water from this source. The trap would then again be in a position to receive the return water from the city heating mains, and the same operation would be repeated.

As to the first source of the supply, the quantity of water that passed through the heater from the city mains was controlled by a float valve. As to the second source of supply, the quantity was very slight. As to the third,— the condensation from the city heating system that was collected in the pit outside the building and that came back through these traps into the heater,—the supply changed with changing conditions in the operation of the system. The quantity of water from this source of supply depended upon the condensation in the radiating system, and the condensation depended upon temperature. If steam was forced into the radiating system, and the system was cold, there would be more condensation, and therefore more water coming back into the pit. There was no automatic control of the amount of water which would return into this pit, and it is not claimed that this could be automatically controlled. The supply was necessarily uncertain and indefinite, and depended upon the amount of steam thrown in and the temperature of the radiating system and its effect in condensing steam into water that might flow back into the pit. If the radiating system was cold, steam would be more quickly condensed and returned into this pit; and the largest amount of water in the pit would be found when the steam, for any reason, had been turned off the city heat

mains, and they were allowed to become cold. Naturally, when the city heat mains became cold, and steam was forced into them, the condensation was great, and the quantity of water greater that came into the pit that might be forced through this trap into the heater.

Of course, the quantity of water that would come into this pit through these traps into the heater would depend largely upon the amount of steam sent into the radiator system, and the condition of the radiators as to being cold or hot. The traps had nothing to do with the supply of water in the pit. They received the water from the pit and passed it on. The amount which the traps would receive depended upon the supply, and the supply depended upon the manner in which the plant was operated, and the condition of the radiating system at the time of operation. The heater could only receive and retain a definite amount of water. There was an electric pump attached to the heater, that raised the water from the heater and cast it into the boilers. This pump had a definite capacity, and, under ordinary conditions, was able to remove the water as fast as, under normal conditions, it could be supplied. The heater was of sufficient strength to sustain itself against pressure normally carried, and to which it would be normally subjected. The control and management of the plant were placed by the city in the hands of the operators, a manager, superintendent, engineer, and fireman.

It will be noted that there is no complaint made of the general system adopted by the defendant. Three complaints are made in plaintiff's petition: First. Want of some device on the heater so as to keep it at a proper level, and for regulating steam pressure. Second. The heater was not strong enough to resist the pressure to which it might become subjected. Third. We take it that this relates to these traps that received the condensed steam from the pit, and it is claimed that they were defective

in that they were so constructed as automatically to allow direct pressure and live steam from the boiler to be injected into the heater. We will consider this third ground first.

The trap or device was not constructed so as automatically to allow great pressure from live steam into the heater, but was automatically constructed so as to prevent the pressure or live steam from the boiler from being injected into the heater. The evidence shows that, when these traps became filled, they dumped, and automatically adjusted themselves so as to prevent live steam from coming into the heater. This was the purpose of their construction, and the evidence discloses that this is what they did, except that, on certain occasions, they did not always tilt back sufficiently to accomplish that purpose. But it is not claimed that they can be so constructed as to absolutely and under all circumstances prevent the pressure of live steam. It is not shown, however, in this case that live steam did escape through, nor is it shown that at this particular time they did not tilt back to their proper position to prevent live steam from escaping through. But however that may be, there is no evidence that is not the usual and ordinary and the proper method of doing the very thing sought to be done by the use of these traps. Further than that, there was a handle on this trap, by which it could be pushed back into position, if it did not automatically adjust itself. Steam is a powerful force, and when set in motion, can only be controlled by human agencies. Here was a contrivance usually and ordinarily deemed sufficient to accomplish the purpose, and to control the force, under ordinary conditions. It was placed in the hands of intelligent beings, whose safety depended upon attention to the details of the work in which they were engaged. A servant is not only required to use his hands, but his head, for his own safety and for the safety of the property under his control.

No question is made that this heater was not, in its

construction, strong enough to resist the normal pressure of the water. These automatic devices were there to prevent live steam from the boiler from being injected into the heater. We may assume that the heater was not sufficiently strong to resist the pressure of the live steam—140 pounds to the square inch—in the event this steam escaped from the control of the automatic device and passed into the heater, but this trap was there to prevent that. Its purpose was known to those entrusted with the management of the plant. It was known that, under certain conditions, this automatic contrivance might not accomplish the full purpose intended by it. The evidence shows that it is a mechanical impossibility to so construct it that it will not, under some conditions, become tilted and admit steam. To prevent this, the hand contrivance was there so that it might be pushed back into position in event it failed to so adjust itself. The heater was not intended to resist the pressure of steam. Its purpose was to hold water while it was being heated to a temperature to be sent into the boilers, and it had no other purpose, and for this it was sufficiently strong.

It is not shown in this record that any contrivance has been invented that would be more effectual in holding the live steam from this heater, under the conditions shown here, than was this trap, placed there by the defendant. Can it be said that in this respect defendant was negligent? The most that can be said is that the defendant should have anticipated that this automatic trap would not work effectually at certain times and under certain conditions, which might or might not be anticipated, and upon the happening of this, live steam might escape and force its pressure upon the contents of the heater to such an extent that the heater could not resist it. But there is no showing in this record that the defendant could have done more to make it effectual for that purpose than did the trap used.

This brings us to a consideration of the

2. MASTER AND SERVANT: place of work: non-supervision of dangerous device.

second proposition. Prefacing our consideration of this proposition, we have to say that the record discloses that the pressure from live steam from the engine was greater than the strength of the heater could resist; that, if the heater could not resist the pressure, it must give way, and an explosion would be the inevitable result. This record discloses, with that certainty which would enable the jury to find it to be a fact, that the city knew, prior to this explosion, that there were times when the traps did not work, and that the pressure of live steam would escape through the traps and reach the heater with a force greater than the heater could stand. It was the recognition of this that called upon the city to provide some method by which this pressure could be relieved from the heater when it became excessive. This fact seemed to have been recognized by the manufacturers of this heater; for, at the time of its manufacture, and at the time it was installed, an overflow pipe was placed in the heater at such a point that, when the pressure became great in the heater, an overflow, releasing the pressure, would take place. After this heater was installed, the defendant, for the purpose, we may assume, of economizing power, or avoiding what it assumed to be the useless escape of steam, caused this overflow pipe to be closed, and a hand valve placed in the heater, to accomplish, we assume, the same purpose. The pipe through which the excessive pressure could be relieved was closed by this hand valve, and the pressure, when it became excessive, relieved only by opening it. The valve, while it remained closed, afforded no escape for excessive pressure. Relief came only through human agency, in the opening of the valve.

Mr. Mullen was superintendent of the plant, employed for that purpose by the city. The plant was installed by the Murray Iron Works. The heater was known as the

Hoppes Heater, and Mr. Blank was connected with the
Murray Iron Company. After the heater had been set up,
Mr. Blank inspected it, and found that the defendant had
removed this overflow pipe and substituted the hand valve.
Mr. Blank told Mr. Mullen and Mr. Mikel that the valve
should be left open; told defendant's superintendent that
the instructions with the heater were to the effect that this
valve should be left open at all times. It remained closed,
however, with the hand valve. The pressure could not be
relieved except by opening the valve by hand. Excessive
pressure could not only be reasonably anticipated, but was
almost certain to come, under certain conditions. The
valve must be opened by someone, to avoid excessive pres-
sure and its consequences. The record does not disclose that
anyone for the company was charged with the specific duty
of controlling this pressure by the hand valve. Mr. Mullen,
as superintendent, had control of the plant for the city.
Mr. Mikel was charged with the duty of looking after the
machinery, pumps, boilers, engines, and everything in con-
nection with the plant. Both of these parties represented
the city, and between them had control of the employees
of the city.

At the time of the accident, Mr. Williamson was fire-
man. He had many duties to discharge which demanded his
attention. He was never directed especially to look after
this valve, to see that it was open, or that the excessive
pressure was relieved. True, there was a water glass that
indicated the pressure, which he might have observed.

Mr. Mikel, who had charge of the pumps and machinery
and general supervision of the plant, testified, when asked
this question:

"And now you are not able or willing to say definitely
whether or not you had given orders to Williamson to keep
track of the water level? A. Whenever a fireman comes in,
the previous employee is usually left to break him in and

show him all about these things. Anything he don't un-
derstand; why, he usually asks about it; but my impres-
sion is that every man that is working around there has
been instructed in what was his work.   I couldn't say
whether I ordered or directed Mr. Williamson, the fireman
in charge, to look after the level of the water in the heater.
I believe I have instructed some of the workingmen there.
I had recognized the necessity of some person looking after
the level of the water in the heater."

Mullen testified:

"I recognized the possibility of water building up there
so as to create mischief somewhere along the line.   I recog-
nized that there is a specific danger when the water gets
beyond its proper level in the heater.   *   *   *   There is no
way of getting excess water out of the heater except through
the hand valve.   There was no other way of lowering the
water in the heater and letting it fall off except as the pump
took it off."

He further said that, except as the water was taken
out by the pump, there was no way by which the excess
water could be lowered or taken out, save by the overflow
valve, which was turned by hand.   He further testified:

"I have noticed the heater flooding or filling perhaps
on an average of three or four times a week.   Sometimes it
would flood two or three times in one night, but the next
night it would not.   I had observed the clogging of this
heater with water before Mr. Weber's injury.   I could not
say how frequently it occurred."

When we start with the proposition that it was the
duty of the city to furnish its servants a reasonably safe
place in which to do their work, and reasonably safe tools
and appliances with which to accomplish the work, we read
this record, and find that the defendant, some time after
the heater was installed, changed the plan of the system,
and closed the overflow pipe with a valve which would pre-

vent the water from running out, in case the heater was filled too full; that it was warned of the danger of this; that no device of any kind was supplied which would regulate or control the level of the water in the heater, though it knew all the time that these automatic traps did not always tilt back, and that excessive pressure was liable to reach the heater, causing specific danger to those in and about the machinery; that the city placed no one in charge with specific duty of relieving pressure by opening the hand valve; that it must have recognized the fact that, after the overflow pipe was closed by the hand valve, there was nothing to prevent the heater from becoming filled with water from the several sources of supply; that no relief was afforded when it became filled, except through human agency; that, notwithstanding this, they directed no person to observe the condition and regulate the pressure, and cautioned no one against the dangers arising from the condition.

It is assumed that it was the duty of Williamson to watch the water glass and regulate the pressure; that he was a fellow servant, for whose negligence defendant is not liable. His duties were, of course, in the room in which the heater was situated. He testified:

"I aimed to watch the heater and gauge on the heater all I could, but my time was nearly all occupied with pushing the heating system."

He said that he could only tell whether or not the overflow pipe should be opened—whether the water was too high—by looking at the water glass.

It is not assumed in this case that the duty to watch this gauge rested upon anyone other than the fireman, upon whom were placed other duties, which occupied his time and attention. It is assumed that either the fireman or engineer, if he observed the heater flooded, would relieve the pressure, and then go on with the work assigned him. The times when this heater became flooded were intermittent.

The nearest this record shows that a specific duty rested upon either the plaintiff, as engineer, or Williamson, as fireman, to watch this gauge and manipulate this hand valve, is, we think, found in the testimony of Mr. Mikel, in which he says:

"At the time of the accident, the duties of the fireman were to look after the steam pressure on the boilers and the water in the heater, and run the pump to pump what water is needed. The engineer is over the fireman, and he looks after the water in the boilers and the steam pressure; carries it at the proper pressure, and looks after his engines and generally all around the plant wherever there is anything to look after. Takes care of everything and sees that it is running, and everything is in working condition."

He says, however, that he was in the boiler room about five minutes before the accident occurred.

"I noticed the amount of steam pressure there on the city mains. I did not at that time observe the amount of water there was in the heater. I went right past. I couldn't say whether the pump was pumping at that time or not. In a way, I have charge or control over the other employees in the city plant, in the absence of Mr. Mullen. I had worked as engineer."

He further testified that, from his knowledge of the situation, he knows that the heater must have been full, or nearly clogged with water, at the time he went by, but that neither he nor Mr. Mullen noticed the gauge.

It further appears in this record that, when the fireman was busy at his work, he had to pass the full length of the boiler room, which was about 40 feet, to look at the water gauge; that, on this particular morning, he was not in a position to see the heater.

We think there was actionable negligence shown in this record, and that this negligence consists in the fact that the city had adopted a mechanical device, attached

it to its machinery, for the purpose of performing a duty which it owed to its servants—a duty to keep the place in which the servants were working in a reasonably safe condition; knew that such device might become dangerous, unless guarded by human agency, and did not provide such agency. It is hornbook law that it is the duty of the master to furnish a reasonably safe place for his servants. It is recognized that the master may perform his duty by the use of mechanical devices, which are designed to and do perform the function charged upon the master in rendering a place, otherwise dangerous, reasonably safe for the servant. But it is also true that, if these mechanical devices require human agency in their manipulation to render the place safe, the duty rests upon the master to see that the agencies are provided; otherwise he has not accomplished his full duty in rendering the place reasonably safe.

We do not enter into any discussion of the relative merits of automatic and hand valves for this purpose; but we do say that, if this heater was unsafe in its construction and in the use to which it was put, it was the duty of the master to take some action, to the end that the pressure might be relieved and the danger avoided. A hand valve attached affords no relief except when manipulated by human agency. Therefore, the mere attachment of a hand valve does not afford the protection to which a servant is entitled, unless supplemented by the intelligent action of some human being; and where a hand valve is used on a device such as we have here, without providing the agency to relieve by opening the valve, nothing in the way of protection is afforded by the valve itself.

We have in this record disclosed, as in general use, what is known as a "U" device, which, being attached to the heater by an elbow, extends up above the heater so that, when the pressure of the heater becomes too great, the water is forced up through the pipe on the U-valve by the action of the wa-

ter itself. This is a device that can be easily and readily attached, and affords sufficient protection from excessive pressure. The relative merits of these several devices need not be discussed. The jury could well have found that negligence lay in attaching this hand valve without providing anyone to relieve the pressure by opening the valve; that the valve served no purpose in protecting the servant, without the aid of human agency, which was unfurnished by the defendant.

The rule seems to be that a duty rests upon the master, when attaching one of these hand valves, to place some human agency in charge, with a direction to manipulate the valve so that it may accomplish the purpose for which it was designed. It is said in *Carlson v. Weyerhaeuser Timber Co.*, 50 Wash. 490 (97 Pac. 501, 30 L. R. A. [N. S.] 267), that, so long as the appellant had made provision for such a contingency, and had placed a man in charge to aid these mechanical devices, it made the working place safe.

We think this is included in the charge of negligence made by the plaintiff. We think the record in this case shows actionable negligence on the part of the defendant, and that the negligence shown could well be said by the jury to be the proximate cause of the injury. Upon the facts of this case, we are satisfied with the verdict of the jury.

Many errors are alleged to have been committed by the court upon the trial of the case. We have examined them all with care, and find no ground for interfering with the action of the court, based upon these assignments.

Upon the whole record, we think the cause should be, and it is, affirmed, except that a careful consideration of all the record leads us to the conclusion that the contention of the defendant that the verdict is excessive should be sustained in part, and the verdict reduced to $12,500. It is, therefore, ordered that plaintiff have judgment against

the defendant for $12,500, with 6 per cent interest from the date of the entry of the original judgment. With this modification, the judgment is affirmed. Costs in this court will be taxed to appellant.—*Modified and affirmed.*

PRESTON, C. J., LADD and SALINGER, JJ., concur.